NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10991


COMMONWEALTH  vs.  MICHAEL FORTE.



Hampden.      January 10, 2014. - August 22, 2014.

Present:  Ireland, C.J., Cordy, Botsford, Gants, & Duffly, JJ.[1]


Homicide.  Identification.  Evidence, Identification,
    Photograph, Videotape, State of mind, Prior misconduct,
    Disclosure of evidence, Exculpatory.  Practice, Criminal,
    Capital case, Motion to suppress, New trial, Identification
    of defendant in courtroom, Required finding, Disclosure of
    evidence, Recalling witness, Self-representation.  Due
    Process of Law, Disclosure of evidence.  Witness,
    Recalling.  Subornation of Perjury.



    Indictment found and returned in the Superior Court
Department on September 24, 2008.

    A pretrial motion to suppress evidence was heard by
Constance M. Sweeney, J.; the case was tried before her; and a
motion for a new trial, filed on September 26, 2012, was
considered by her.


    Kevin S. Nixon for the defendant.
    Katherine A. Robertson, Assistant District Attorney, for
the Commonwealth.

_____

    [1] Chief Justice Ireland participated in the deliberation on
this case prior to his retirement.

CORDY, J.  Shortly before 3:30 A.M. on July 27, 2008, Steven Donoghue, a homeless man, was stabbed in the alcove of a storefront at the intersection of State and Bliss Streets in downtown Springfield.  He died several hours later following extensive surgery.  Two young women, who had gone out for a late-night meal, reported the incident after having passed the victim alive and minutes later discovering him bleeding profusely.  They had seen only one other person on the street that night.  Through a series of identification efforts, including reliance on footage from surveillance videotapes, the defendant was identified and indicted as the perpetrator.

Following a trial at which the defendant represented himself with the assistance of standby counsel, the defendant was convicted of murder in the first degree on the theory of extreme atrocity or cruelty and sentenced to life in prison. Through appellate counsel, the defendant appeals from his conviction and from the denial of his motion for a new trial and for an evidentiary hearing.[2]  He asserts that the judge, who

---

[2] After trial, the trial judge granted the defendant's motion for appointment of appellate counsel and denied his pro se motion to set aside the verdict, declare a mistrial, and provide postverdict relief.  After appointment of appellate counsel, the defendant filed several motions on his own, on which the motion judge, who was also the trial judge, took no action because they were not filed by appellate counsel. Appellate counsel was initially appointed in June, 2010, and replaced in January, 2012.  Replacement appellate counsel filed a motion for a new trial and evidentiary hearing before this

served as trial judge and motion judge for all relevant matters, erred in denying his motion to suppress identifications, permitting the introduction of evidence of prior bad acts to show the defendant's state of mind, denying his motion for a required finding of not guilty, and denying his request to recall the two percipient witnesses, which was the subject of his motion for a new trial.  In addition, he claims that his due process rights were violated by the Commonwealth's untimely disclosure of access codes needed to view the footage of the surveillance videotapes secured from the MassMutual Center (MassMutual), a local civic and convention center.  Finally, independent of his appellate counsel, the defendant asserts that the Commonwealth knowingly procured false testimony in such a way that merits reversal of his conviction.

We conclude that the judge did not err in permitting the introduction of state of mind evidence where she provided numerous limiting instructions, and did not err in denying the defendant's motion to suppress and his motion for a required finding.  We also conclude that the defendant was not denied timely access to the MassMutual footage in a way that prejudiced the preparation of his defense, that the judge did not abuse her discretion in denying the defendant's request to recall the

court, which was remanded to the trial judge and denied.  That denial is a subject of this consolidated appeal.

percipient witnesses, and that the defendant's false testimony claim is unmeritorious. Because we find no reversible error and discern no basis to exercise our authority under G. L. c. 278, § 33E, we affirm the defendant's conviction.

Background. We summarize the evidence presented by the Commonwealth at trial, reserving certain details for our discussion of the issues raised and including other details relevant to our discussion of the motion to suppress. At approximately 3 $\underline{\text{A}}$.$\underline{\text{M}}$. on July 27, 2008, Ivette Torres and her cousin, Jariely Vazquez, who were both eighteen years of age at the time, decided to get something to eat. They left Torres's house on Howard Street in Springfield, walked to Main Street, and turned left onto Main Street to head toward the Crown Fried Chicken restaurant, located on the northwest corner of State and Main Streets. As they walked along the west side of Main Street, they passed the victim, a local homeless man who was resting in the alcove of Chapin's Furniture Store at the intersection of Main and Bliss Streets. The women exchanged greetings with the victim, whom they had seen before in the neighborhood, and continued onward.

Very shortly thereafter, the women noticed a man coming toward them from in front of the restaurant. As the man approached, he shouted at the women angrily, calling them "bitches and sluts." The women had almost reached the corner of

State and Main Streets when they decided to cross Main Street because they were afraid of the approaching man. They observed that the man continued to walk south along the west side of Main Street, toward where they had seen the victim.

When the women reached the United Bank on the northeast corner of State and Main Streets, they looked across the intersection and saw that the restaurant was closed. They turned back to return to Howard Street and noticed the man who had been shouting at them washing his hands in a puddle "next" to where they had seen the victim. When they heard an automobile horn, the women turned away, and when they looked back the man was gone. The women walked south on Main Street, back in the direction from which they came, and crossed Main Street near Bliss Street. When they approached the alcove where they had seen the victim resting, they saw that his throat had been slit and he was covered in blood. Torres attempted to dial 911 from her cellular telephone but the battery had died, and the women continued south on Main Street until they were able to stop a passing motor vehicle and contact the police.[3] From the time they left Torres's apartment to the time they sought assistance in calling the police, the women did not see anyone

---

[3] When the police arrived, they found the victim slumped back in the alcove, bleeding heavily, with a green duffle bag next to him containing a variety of personal effects.

else on Main Street other than the victim and the man who had shouted at them.

1. Identification. The women initially described the man they had seen to the police as "a white male . . . wearing a black T-shirt [and] tan pants," in his forties, "with a pot belly but not really fat or built." They described his hair as "bushy, blond, possibly whitish" or gray, and "scruffy." Both women observed that the man had white lettering on the front and back of his shirt and that he was walking strangely.[4] An officer broadcast a description of the perpetrator as approximately forty to fifty years of age, with "kind of bushy, shoulder-length, blondish-gray hair, wearing a black T-shirt and tan pants."[5] The women went to the police station and were shown many photographs of men who were under fifty years of age, none of whom they recognized.[6]

At around 6 A.M., a police detective was returning to the station from the scene when he saw the defendant leaving a small park wearing a black T-shirt and tan pants. He observed that

_____

[4] Ivette Torres testified that they were within fifteen feet of the man that night and had gotten a fairly good look at him. Jariely Vazquez said they were within twenty to thirty-five feet of him.

[5] The shoulder-length descriptor appears to have been in the description broadcast but was not specifically mentioned in the witnesses' initial statements.

[6] These photographs were those of white males between forty and fifty years of age from the police database.

the defendant's clothing was wet and his shirt was inside out, and that he fit the general description of the potential perpetrator.[7] The detective stopped, asked to speak to the defendant, and conducted a pat-down to ensure he had no weapons. The detective then informed the police dispatch that he had found an individual who fit the description of the perpetrator.

Shortly thereafter, another detective brought Torres and Vazquez to the area. The detective instructed only Torres to step out of the police cruiser and look at the man. She understood that she was to determine whether it was the man she had seen three hours prior. She later reported that she did not feel rushed. Torres told the detective and Vazquez that, although the man had similar clothing, he was not the man she had seen.[8] Afterward, the women returned to the station to look at more photographs, to no avail.

On July 28, the police acquired footage from the surveillance videotapes at MassMutual, located at the northeast corner of State and Main Streets, and from the restaurant. The MassMutual footage from around the time of the murder shows a

---

[7] In the early morning hours of July 27, 2008, there had been occasional thunderstorms and showers. Shortly after the police arrived at the scene, there was a torrential downpour.

[8] At the hearing on the defendant's motion to suppress the identifications, Torres testified that she thought the defendant was in fact the man she had seen earlier, but that she had been afraid to say so.

silhouette walking south on the west side of Main Street, crossing in front of the restaurant, wearing a dark top and lighter pants.[9]  The restaurant videotape, which provides a clearer image, depicts an individual, walking south on Main Street, who the police determined fit the description provided by the two women.  Two officers familiar with the defendant, who had each seen him within the last two days, recognized him as the man in the restaurant videotape.[10]

Later that day, the two women returned to the police station, where each woman was shown the restaurant videotape separately and asked if she saw anybody that she did or did not recognize.  Both confirmed that the man in the videotape was the man they had seen that night.  Torres also indicated that it was the same man she had seen at the showup the day before, but that she had not recognized him then because his hair had been darker and wet and his shirt was inside out, hiding the white lettering.  Immediately after watching the videotape, each woman was shown a photographic array containing eight individual color photographs, and each selected the defendant as the man she had

---

[9] The footage from the MassMutual Center (MassMutual) also depicts two females standing in front of the United Bank, looking across Main Street.

[10] One of these officers identified the defendant in court. In her ruling on the defendant's motion to suppress the identifications, the judge also observed that the man in the videotape bore a close resemblance to the defendant.

seen that night and in the videotape.[11,12]  At trial, both witnesses watched the restaurant videotape and provided in-court identifications of the defendant as the man in the videotape and the man they had seen that night.

In addition to the introduction of the restaurant videotape and MassMutual footage at trial, other evidence corroborated the identification of the defendant as the man in the videotapes and the man the two women had seen that night.  A security officer had seen the defendant in a park near Tower Square at approximately 8:20 P.M. on July 26 and had asked him to leave because he was drinking beer.  Surveillance footage of the park admitted at trial revealed a man who closely resembled, both in physical appearance and attire, the man in the restaurant videotape and fit the description the two women had provided.  A Springfield police officer also had observed the defendant, whom he recognized from a police department homeless initiative, at

---

[11] Torres also identified the defendant as the man at the showup.

[12] According to the evidence presented at the hearing on the defendant's motion to suppress the identification, the array included the defendant's photograph along with others selected by a police detective from a group of computer-generated photographs of men between the ages of forty-eight and fifty-two and who matched other characteristics of the defendant.  Each woman was told that the man she had seen may or may not be among the photographs, and that she should inform the officer if she recognized anyone.

approximately 11:30 P.M. on July 26 wearing khaki-colored pants and a dark blue or black T-shirt with a white emblem on it.

Another individual testified that he had been in the park on the morning of July 27 and had seen the defendant there, whom he had seen around and knew to be homeless. Surveillance footage of the park showed the defendant, who fit the women's description.[13]

2. State of mind evidence. The Commonwealth also introduced evidence of several incidents within the sixteen-hour period preceding the murder to establish that the defendant was in a hostile and aggressive state of mind at the time of the murder. On July 26, at approximately 11 A.M., the defendant was discharged from Providence Hospital after he had engaged in disruptive and violent behavior, including turning over the furniture in the television room, throwing a chair into the hallway, shouting obscenities, and threatening to kill people. At approximately 4 P.M. that day, the defendant had caused a disruption in a local supermarket, where he was "looming over" a female customer, shouting in her ear and saying that he wanted to kill her and kill Hispanics, and that he was drug-addicted and was going to start killing people because they made him sick. The store manager, who described the defendant as

---

[13] In the footage and accompanying still images, the defendant's shirt is on backwards and inside out.

"unstable and dangerous," cautiously walked him to the front of the store, where police officers escorted him away. At approximately 8 P.M., the defendant appeared on a surveillance videotape in a park near Tower Square, a few blocks from the intersection of State and Main Streets, apparently chasing two other men out of the park, before he was asked to leave by a security officer for drinking beer. Finally, at approximately 11 P.M., the defendant went to McCaffrey's Public House, a bar on Main Street just south of State Street, and ordered a beer. As he left, he had an outburst, appearing suddenly angry and shouting that everyone in the bar was "human scum."

Discussion. We begin by addressing the evidentiary issues and then turn to the defendant's remaining claims.

1. Evidentiary issues. a. Motion to suppress identifications. The defendant contends that the judge erred in denying his motion to suppress both out-of-court and prospective in-court identifications made by the percipient witnesses, Torres and Vazquez, which he alleges were the product of unnecessarily suggestive procedures.[14] There was no error in the denial of the motion and subsequent admission of the identifications.

---

[14] The defendant was represented by counsel at the hearing on his motion to suppress. After the denial of the motion, the defendant proceeded pro se and filed a motion "to disallow the prosecution from seeking in-court identification of defendant from crime scene witnesses." This motion was denied.

The identification process testified to at trial, as outlined above, was virtually identical to the evidence presented at the motion to suppress hearing and summarized by the judge in her memorandum of decision. In a written order, the judge concluded that the defendant's motion to suppress the identifications failed on two grounds. First, to the extent the defendant challenged the showup, this identification actually could assist the defendant by casting doubt on the defendant's identity as the perpetrator. Further, the showup was not unnecessarily suggestive and conducive to irreparable mistaken identification procedures.

Second, the identifications made from the photographic array, following the videotape screening, did not violate the defendant's due process rights, because credible evidence established that both of the women had a good opportunity to observe the defendant, including his features and clothing, near the time and place of the crime, for several moments as he approached them; the identifications were made within a reasonable time following the women's initial observation of the perpetrator; the police complied with neutral identification procedures; and the police made no attempt to suggest to the women that the defendant was a suspect.

On appeal, the defendant asserts that by showing the women the videotape, which depicted a single individual who appeared

very similar to the defendant, immediately prior to conducting the photographic array, the police engaged in an unnecessarily suggestive procedure that encouraged the women to select the photograph that most closely resembled the man in the videotape rather than the man they had seen that night.  Instead, the defendant contends, the police should have conducted the photographic array first, or waited until the defendant was arrested and conducted a lineup.

"In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error, 'but conduct an independent review of [her] ultimate findings and conclusions of law.'"  Commonwealth v. Scott, 440 Mass. 642, 646 (2004), quoting Commonwealth v. Jimenez, 438 Mass. 213, 218 (2002).  See also Commonwealth v. Moon, 380 Mass. 751, 756 (1980) ("The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw the witnesses").  We are not persuaded that the judge erred in denying the motion.

An identification stemming from a videotape containing only one individual is analogous to a one-on-one identification, which is considered inherently suggestive.  See Commonwealth v. Austin, 421 Mass. 357, 361 (1995).  A one-on-one pretrial identification raises due process concerns only if it is "unnecessarily suggestive of the defendant . . . so as to give

rise to a very substantial likelihood of a mistaken identification" (citations omitted). Moon, 380 Mass. at 758, and cases cited. To suppress an identification, the defendant must prove by a preponderance of the evidence, in light of the totality of the circumstances, that the identification procedure employed was "so unnecessarily suggestive and conducive to irreparable misidentification that its admission would deprive the defendant of his right to due process." Commonwealth v. Walker, 460 Mass. 590, 599 (2011), and cases cited.

In assessing the suggestiveness of an identification, we consider "whether good reason exists for the police to use a one-on-one identification procedure." Austin, 421 Mass. at 361. Here, the police had reason to believe that the defendant was the man the women had seen, based on an officer's identification of him in the restaurant videotape. However, they wanted to confirm that they were viewing the correct time frame in the videotape and that the man in the videotape was indeed the man the women had seen. See id. at 362, citing Commonwealth v. Barnett, 371 Mass. 87, 92 (1976), cert. denied, 429 U.S. 1049 (1977) (good reason includes "usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another track"). Conducting the photographic array prior to showing the videotape would require the police to create the array with the

assumption that they were correct that the man in the videotape, whom they believed to be the defendant, was the same man whom the women had seen that night.  By showing the women the videotape first, the police were able to confirm this assumption and then proceed to the next step in the identification process.  Had the women not identified the defendant in the photographic array, the police would have at least confirmed that the videotape footage offered a reliable representation of the perpetrator.  Cf. Austin, supra at 362 (police may consider reliability of percipient witnesses in determining identification procedures).[15]

As to the propriety of the array itself, we decline to disturb the judge's ruling.  The police appear to have complied with the guidance set forth in Commonwealth v. Silva-Santiago, 453 Mass. 782, 797-799 (2009), including informing the witnesses that the perpetrator may or may not be in the photographs, avoiding any suggestion or influence of the witnesses in their selection, and employing a permissible display of photographs by handing the set to each witness and instructing her to view them individually.  We defer to the judge's determination that the photographic array was "fair and reasonable," and "untainted by

---

[15] Even if conducting the photographic array first or using a lineup would have been a reasonable alternative, "[f]ailure of the police to pursue alternate identification procedures does not in itself render an identification unduly suggestive." Commonwealth v. Martin, 447 Mass. 274, 280 (2006).

any suggestion of who the assailant might be."  See Silva-Santiago, supra at 795 (array not unduly suggestive where "men depicted therein possess reasonably similar features and characteristics").[16]

The defendant's emphasis on the possibility that the women identified in the array the man from the videotape, rather than the man they had seen that night, is a challenge to the weight of the identifications and not their admissibility.  See Commonwealth v. Sullivan, 436 Mass. 799, 806-807 (2002).  Any potential issues with the women's ability to perceive the man who walked down the street and who was stopped at the puddle, or to recognize the man in the videotape or identify him in the photographic array, or any inconsistencies between their identifications and the other evidence presented, such as the videotape footage, could have been raised through cross-examination.  See Walker, 460 Mass. at 606-607.  The judge properly reserved an assessment of the weight of the identifications and the credibility of the witnesses for the jury.  See id.; Commonwealth v. Odware, 429 Mass. 231, 236

---

[16] The Springfield police detective who prepared the array testified that he had tried to select photographs of other men who resembled the defendant.  On cross-examination of the witnesses, defense counsel permissibly but unsuccessfully sought to demonstrate that the other photographs did not resemble the defendant.

(1999), quoting Commonwealth v. Martin, 399 Mass. 201, 208 (1987).

b. Admissibility of prior bad acts. The defendant next asserts that the judge erred in admitting, over objection, the evidence of the four instances of aggressive conduct by the defendant within the sixteen-hour period preceding the murder because they were irrelevant to the issue of identification and unduly prejudicial, suggesting only that the defendant had a bad temper and a propensity to commit such crimes. We agree with the Commonwealth that this evidence was properly admitted to show the defendant's state of mind and motive and was properly and thoroughly limited to this purpose by the trial judge.

Evidence of a defendant's prior bad acts is inadmissible to show a propensity to commit the crime or to illustrate bad character. Commonwealth v. Triplett, 398 Mass. 561, 562 (1986), quoting Commonwealth v. Helfant, 398 Mass. 214, 224 (1986); Commonwealth v. Trapp, 396 Mass. 202, 206 (1985), S.C., 423 Mass. 202 (1996), cert. denied, 519 U.S. 1045 (1996), and cases cited. However, such evidence may be admissible if it is relevant for some other purpose, such as "common scheme, pattern of operation, identity, intent, or motive," as long as its probative value is not substantially outweighed by its prejudicial effect. Commonwealth v. Marrero, 427 Mass. 65, 67 (1998), and cases cited. We will not disturb a judge's exercise

of her sound discretion in conducting this balancing absent palpable error.  Id. at 68, quoting Commonwealth v. Valentin, 420 Mass. 263, 270 (1995).

The defendant challenges the admission of testimony that he was physically or verbally abusive to his environment or to those around him on four occasions on July 26:  at the hospital at approximately 11 A.M., at the supermarket at approximately 4 P.M., at the park at approximately 8 P.M.,[17] and at the bar at approximately 11 P.M.[18]  Prior to ruling on the admissibility, the judge carefully considered over the course of several days the probative value of the evidence as to the defendant's state of mind and motive in relation to its potential for prejudice.[19]

---

[17] The judge also permitted the use of the footage from the park for identification purposes, as it would show the defendant at approximately 8 P.M. in attire that matched the percipient witnesses' description.

[18] The judge did not permit the use of evidence regarding an incident in the park after the murder, at approximately 8 A.M. on July 27, to show the defendant's state of mind, but did permit it for the purpose of showing that the defendant was wearing the same attire as in the witnesses' description and that his T-shirt was on backwards.

[19] The judge heard arguments on the Commonwealth's motion in limine on the first day of trial.  Revisiting the issue prior to opening statements on the second day, she observed that the conduct evidence had probative value as to the defendant's state of mind, but that she was unsure whether the probative value outweighed the prejudicial effect.  The judge asked the Commonwealth not to refer to this evidence in its opening because she wanted to reserve decision on the issue until she had heard some of the evidence.  On the second day of trial, after three witnesses had testified, the judge heard additional

Her reasoning and ultimate decision to admit the testimony were not in error.

The evidence of the four incidents on July 26 served a limited and probative purpose of illustrating the defendant's angry state of mind in the hours preceding the murder.  See Commonwealth v. McGeoghean, 412 Mass. 839, 841 (1992).  Contrast Triplett, 398 Mass. at 563 (evidence inadmissible because did not advance permissible purpose and only depicted defendant "as a violent, aggressive, and dangerous individual" guilty of crime charged because of bad temper).  Given the close temporal proximity of the incidents to each other and to the murder, and the similar nature of the defendant's outbursts to the interaction he had with Torres and Vazquez, see Commonwealth v. Cordle, 404 Mass. 733, 740 (1989), S.C., 412 Mass. 172 (1992), the evidence here had a "rational link," Trapp, 396 Mass. at 207, to the women's testimony that the only man they saw on the street, who was unfamiliar to them, was angry and shouting obscenities at them.  The inferences the Commonwealth believed the jury could make from this prior conduct evidence were reasonable and possible, and advanced the Commonwealth's theory

---

arguments, permitting standby counsel to argue the motion on the defendant's behalf given the seriousness of the issue.  After ruling that the evidence would be admissible, she required the Commonwealth to demonstrate that it could "prove[] up" the incidents and to ensure that the evidence would be limited to state of mind and motive.

of the case that the defendant was in a state of mind at the time of the murder that led him to engage in unprovoked acts of hostility.[20]  See Commonwealth v. Montez, 450 Mass. 736, 746 (2008); Commonwealth v. Scott, 408 Mass. 811, 818-819 (1990).

In addition, the judge ensured that the jury were instructed on numerous occasions regarding the limited purpose for which the evidence could be used, thereby minimizing any prejudicial effect.[21]  See Marrero, 427 Mass. at 73.  See also

---

[20] Although the judge indicated that this evidence was admissible only to show the defendant's state of mind, with the exception of the 8 P.M. incident in the park, which was also admissible for identity, we note that evidence of all of these incidents also likely would have been admissible for the purpose of showing the defendant's identity.  The defendant's conduct at each location and his interaction with the percipient witnesses on Main Street consisted of unprovoked acts of rage and hostility toward strangers, in which he used similar derogatory and threatening language.  As such, there were "meaningfully distinctive" elements "common to the [circumstances of the crime] and [the] former incidents to warrant the admission of evidence of prior bad acts as tending to prove that the defendant was the person who committed the crime charged." Commonwealth v. Brusgulis, 406 Mass. 501, 505, 506 (1990).

[21] The judge carefully considered the appropriate timing of the limiting instructions.  She stated that she would give the instruction with each event, unless the defendant requested a lesser frequency.  Before the Commonwealth introduced the evidence, the judge provided a preview instruction, as requested by the defendant, informing the jury that the evidence could be used only for a limited purpose that would be explained later. With each witness, the judge reminded the jury of the limited use.  When the Commonwealth finished presenting its evidence on these incidents, the judge provided a lengthy instruction, specifically mentioning each piece of testimony and informing the jury that the evidence could be used for the defendant's state of mind and motive, but not for proof of an act, bad character, or propensity.  Later, when the Commonwealth called

McGeoghean, 412 Mass. at 842. The judge did not err in admitting the evidence in this limited capacity.

c. Motion for required finding. At the close of the Commonwealth's case, the defendant moved for a required finding of not guilty, which the judge denied without discussion.[22] The defendant contends on appeal that this denial was in error because the evidence presented merely placed the defendant in the general proximity of the crime scene but nothing more. We disagree. The evidence and the reasonable inferences drawn therefrom were sufficient to warrant a finding that the defendant was guilty of murder. The judge properly denied the motion and left the assessment of the weight and credibility of the evidence for the jury. See Commonwealth v. Semedo, 456 Mass. 1, 8 (2010), and cases cited; Commonwealth v. Martino, 412 Mass. 267, 272 (1992), and cases cited.

"In reviewing the denial of the motion, we consider the evidence, together with permissible inferences from that evidence, in the light most favorable to the Commonwealth and 'determine whether any rational trier of fact could have found

one additional witness regarding the supermarket incident, the judge reminded the jury of the limiting instruction. In the specific instructions at the end of trial, the judge again provided direction to the jury regarding the use of the evidence for the limited purpose of state of mind and motive.

[22] Because the defendant did not present any evidence, the judge determined that renewal of the motion was not necessary and denied the motion at the close of the Commonwealth's case.

the essential elements of the crime beyond a reasonable doubt.'" Commonwealth v. Platt, 440 Mass. 396, 400 (2003), quoting Cordle, 412 Mass. at 175. See Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). The Commonwealth must have presented sufficient evidence "as a matter of law to sustain a conviction on the charge" of murder in the first or second degree. Mass. R. Crim. P. 25(a), 378 Mass. 896 (1979). As long as the inferences are "reasonable and possible," the evidence may be wholly circumstantial. See Commonwealth v. Linton, 456 Mass. 534, 544 (2010), quoting Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007), and 460 Mass. 12 (2011).

The jury reasonably could have concluded beyond a reasonable doubt that the defendant was the only person with the opportunity to murder the victim. See Commonwealth v. Merola, 405 Mass. 529, 535 (1989). They could have credited the percipient witnesses' statements that they saw only one person, a middle-aged man with blondish-gray hair in tan pants and a black T-shirt with white lettering, while they were walking on Main Street, and that the desolation of the street was supported by the MassMutual footage.[23] They could have credited further

_____

[23] We reject the defendant's contention that the MassMutual footage supports entry of a finding of not guilty because it calls into question the percipient witnesses' credibility. The MassMutual footage not only is difficult to parse from a timing perspective but also is not inconsistent with the witnesses' accounts of what happened that night. See Commonwealth v. Lao,

the percipient witnesses' testimony that they saw this one man walking toward Bliss Street on the west side of Main Street and then observed him washing his hands in a puddle, mere feet from the victim, whom they had seen alive minutes earlier and covered in blood moments later.  The identification of the defendant as that man was supported not only by the women's identifications of him in the photographic array and at trial, but also by a plethora of documentary evidence and accompanying testimony showing that the defendant matched the description provided by the two women prior to their viewing of any photographs, videotape footage, or other images of the defendant.  Thus, reasonable inferences supported the conclusion that the defendant had the opportunity, indeed the exclusive opportunity, to commit the crime, not just that he was in the general area of the crime.  See Platt, 440 Mass. at 401 n.6 ("Commonwealth is not required to prove that no one but the defendant could have committed the crime").  Contrast Commonwealth v. Salemme, 395 Mass. 594, 600-601 (1985) (Commonwealth had not sustained burden where evidence presented two persons with equal opportunity to commit murder, and evidence did not show more than mere opportunity).

---

460 Mass. 12, 22 (2011).  Interpretation of the footage in relation to the witnesses' testimony was for the jury.

In addition, the Commonwealth presented sufficient evidence, even if circumstantial, that permitted the jury to make the reasonable and possible inference that the defendant also had a motive to commit the crime.  See Linton, 456 Mass. at 545.  From the testimony regarding the defendant's activities in the sixteen hours leading up to the murder, the jury could have concluded that the defendant was in a sustained, hostile, aggressive state of mind on the night of the murder, and that this led him to engage in an act of violence toward another homeless man that would otherwise seem inexplicable and unprovoked.[24]

The Commonwealth's case therefore was not limited to "mere presence at the scene of the crime," Commonwealth v. Mazza, 399 Mass. 395, 399 (1987), citing Commonwealth v. Casale, 381 Mass. 167, 173 (1980), requiring the jury to engage in "impermissible conjecture or surmise." Mazza, supra.  Taking this evidence overall in the light most favorable to the Commonwealth, the jury reasonably could infer that the defendant stabbed the victim, causing his death, because he had the exclusive opportunity to do so, see Merola, 405 Mass. at 535, and he was in a hostile state of mind that gave him the motive to do so.

---

[24] The jury could have made further inferences regarding consciousness of guilt from the evidence that the defendant's T-shirt had been turned inside out sometime after the murder.  See Commonwealth v. Paradise, 405 Mass. 141, 157 (1989).

See Commonwealth v. Rojas, 388 Mass. 626, 630 n.1 (1983), quoting Commonwealth v. Porter, 384 Mass. 647, 653 (1981) (state of mind evidence, "coupled with other probable inferences, may be sufficient to amass the quantum of proof necessary to prove guilt"). Accordingly, the judge did not err in denying the defendant's motion.

2. MassMutual surveillance footage issues. We turn next to the three claims presented by the defendant relating at least in part to the introduction of the MassMutual footage at trial. He argues that the delay in the Commonwealth's provision of the access codes for the MassMutual footage denied the defendant his right to a fair trial such that he was unable to present an adequate defense in reliance on this footage; that the judge erred in denying his request to recall the percipient witnesses after the MassMutual footage was introduced in evidence so that he could cross-examine them on the inconsistencies between their testimony and that footage; and that these inconsistencies demonstrate that the Commonwealth knowingly presented false material evidence through the two percipient witnesses' testimony. We begin with a brief summary of the MassMutual footage in relation to the percipient witnesses' testimony.

Vazquez testified that she and Torres had reached the southwest corner of the intersection of State and Main Streets when they saw the man walking toward them, about to cross State

Street, shouting obscenities at them.  Torres reported that they first saw the man as he was passing the restaurant, and that they crossed the street once they were within ten to fifteen feet of him.  Both Vazquez and Torres testified that they saw no one else on the street that night other than the man and the victim.

The MassMutual footage consists of images collected by a moving camera following a predetermined loop.  The camera was set to pan the street from the northeast corner of State and Main Streets, across Main Street, and then from north to south along Main Street.[25]  According to the defendant's interpretation of the MassMutual footage, there are several discrepancies between the witnesses' testimony and the footage.  When the person identified as the defendant was walking toward State Street on the west side of Main Street, at the time at which Torres and Vazquez said they first saw him,[26] the two women were "absent from the scene."  In addition, the footage seems to show several other persons in the area shortly before the time at which the man identified as the defendant was seen on the

---

[25] The color footage captured figures, but was not sufficiently detailed to enable an identification based on the footage alone.

[26] There was some discrepancy between the time stamps on the videotape from the restaurant and the MassMutual footage.  This made it somewhat difficult to rely on precise time stamps at trial.

videotape:  one standing in the doorway of the restaurant, one walking north near the bank at the southeast corner of State and Main Streets, and one walking north on the sidewalk directly under the MassMutual camera.  The defendant suggests that this documentary evidence is sufficiently clear to render the testimony of Torres and Vazquez unreliable and not credible.  At trial, however, he argued that the quality of the footage was so poor that it could not be relied on for identification purposes.

Our own review of the still images of the MassMutual footage indicates that the content was open to interpretation and did not definitively establish that the defendant could not have committed the crime.  Accordingly, its interpretation, in relation to the other evidence presented at trial, was properly reserved for the jury.  It is with this understanding that we proceed to address each of the defendant's related claims.

a.  <u>Untimely disclosure of access codes</u>.  The defendant first contends that the Commonwealth delayed in disclosing the access codes necessary to view the MassMutual footage, thereby denying the defendant of due process of law by preventing him from learning the value of that evidence.

When the Commonwealth began to introduce the MassMutual footage at trial, the defendant requested sidebar and indicated that he was unsure if he had had the opportunity to review the footage that would be shown.  The Commonwealth explained that it

would be introducing the MassMutual footage from July 27 between 3 A.M. and 3:30 A.M., which had been provided to the defense, and described what the footage would depict. The defendant consulted with standby counsel and stated, "[A]s I understand it, there is nothing in there I haven't been made aware of, so I withdraw my objection." The footage was introduced in evidence and shown to the jury without further objection.[27]

The defendant claims on appeal that he lacked sufficient time to review the footage and learn its evidentiary value, and that he had made known to the court the delay in receiving the access codes through several motions prior to trial. Had he had more time, the defendant asserts, he could have prepared a more cogent defense that challenged the credibility of the percipient witnesses' testimony by way of the MassMutual footage.

Because the defendant did not object when the footage was introduced at trial, and because he had a fair opportunity to raise this claim in his motion for a new trial but did not do so,[28] we consider the claim waived, see Commonwealth v. LeFave,

---

[27] The defendant did object to the subsequent admission of still images from the MassMutual footage, claiming that they had no probative value because they were too indecipherable to permit identification, and were overly prejudicial because they would lead the jury to speculate. The judge overruled the objection and permitted the introduction of the images.

[28] The MassMutual footage also was discussed at the evidentiary hearing on the defendant's motion to suppress prior to trial. At no point during the hearing or during trial did

430 Mass. 169, 172-173 (1999), quoting Commonwealth v. Amirault, 424 Mass. 618, 639, 644 (1997), and accordingly review the alleged error for a substantial likelihood of a miscarriage of justice. See Commonwealth v. Randolph, 438 Mass. 290, 294 (2002).

The Commonwealth is required to disclose exculpatory, material evidence "at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case." Commonwealth v. Wilson, 381 Mass. 90, 107 (1980), quoting United States v. Pollack, 534 F.2d 964, 973 (D.C. Cir.), cert. denied, 429 U.S. 924 (1976). Where such evidence is disclosed belatedly, "it is the consequences of the delay that matter, not the likely impact [of the evidence]." Id. at 114. Even assuming that there was a meaningful delay in the disclosure of the access codes, the defendant has not demonstrated how, with more timely disclosure, he "would have been able to prepare and present [his] case in such a manner as to create a reasonable doubt that would not otherwise have existed." Id. The defendant had ample opportunity to cross-examine witnesses about the MassMutual footage and to incorporate references to the footage in his opening and closing arguments. See Commonwealth v. Cundriff, 382 Mass. 137, 150-151

the defendant or his counsel express concern that the MassMutual footage had not been sufficiently disclosed.

(1980), cert. denied, 451 U.S. 973 (1981). As such, he has failed to show any prejudice, let alone that any delay caused a substantial likelihood of a miscarriage of justice.

b. Request to recall witnesses. We next consider whether the judge erred in denying the defendant's request to recall the percipient witnesses in the presentation of the defense.

Prior to trial, the defendant filed a motion to expand the witness list to include Vazquez and Torres. The judge noted that they were already on the witness list and confirmed that the defendant understood this. The Commonwealth's presentation of evidence proceeded as follows. The Commonwealth called Torres as the second witness and introduced the restaurant videotape through her. The defendant cross-examined the witness on her account of what had happened that night, the description she provided of the man she had seen, the showup, her viewing of the restaurant videotape, and the photographic array. Vazquez was called on the second day of evidence, and the defendant cross-examined her as well. Later that day, the MassMutual footage was admitted through Springfield police Sergeant Roy Carter.

On the third day of evidence, when the Commonwealth expected to rest, the parties spoke with the judge regarding the presentation of the defense. The defendant indicated that he wanted to recall Torres and Vazquez because he wanted to

introduce their witness statements and wanted to discuss the issue of mistaken identification.  The judge stated that the defendant had had an opportunity to do this on cross-examination of both witnesses.  The defendant responded that there was "a little bit of misunderstanding" because he believed that during the Commonwealth's case-in-chief, his cross-examination was limited to the direct testimony, and that as a result he did not ask all of the questions he had wanted to.  The judge stated that the defendant's cross-examination had gone beyond the scope of direct examination, and she did "not accept [his] representation" regarding the scope of his cross-examination of them.  She concluded that he "had a full and fair opportunity, which [he] used to cross-examine the identifying witnesses on all aspects," and that he simply wanted "a second bite at the apple to do that which [he had] already done."  She therefore denied the defendant's request to recall the percipient witnesses.  The judge did, however, permit the introduction of the written statements made by Torres and Vazquez to the police on July 27 and 28, because the statements were relevant and the women had authenticated them in their testimony.

The defendant challenged the judge's ruling in his pro se motion for a new trial under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), which the judge refused to consider because it had not been filed by the appellate counsel

who represented him at the time.  Two years later and through new appellate counsel, the defendant filed another motion for a new trial and for an evidentiary hearing, which was considered and denied by the judge.  In that motion, he asserted that the judge's denial of his request to recall the percipient witnesses deprived him of his right to present a defense.

In denying the motion, the judge, who was also the trial judge, recognized that the defendant had represented himself, with the assistance of standby counsel, and that the central issue at trial was identification.  She noted that the defendant had engaged in vigorous cross- and recross-examination with each of the percipient witnesses that was "thorough and repetitious." Revisiting the discussion they had had regarding the defendant's request to recall, she stated that the defendant had not offered any reason why recall was necessary other than that it was his right to do so.  In his motion for a new trial, he provided no new explanation and no legal authority for his request.  On appeal, the defendant again contends that the judge's ruling denied him the opportunity to examine the percipient witnesses, specifically regarding the MassMutual footage.

We review the judge's denial of the motion for a new trial for "a significant error of law or other abuse of discretion." Commonwealth v. Grace, 397 Mass. 303, 307 (1986).  We give special deference to the rulings of a motion judge who was also

the trial judge.  Id.  The manner and order of the presentation

of evidence and the interrogation of witnesses is entrusted to

the sound discretion of the trial judge.  See Mass. G. Evid.

§ 611(a) (2014).  This includes the determination "[w]hether or

not a witness should be recalled in a criminal case."

Commonwealth v. Hicks, 375 Mass. 274, 276 (1978), citing

Commonwealth v. Williams, 5 Mass. App. Ct. 809, 809-810 (1977).

Recall is appropriate if the defendant would otherwise be

"unreasonably deprive[d] . . . of an opportunity to present

newly discovered information material to the defense."  Hicks,

supra at 276-277.

The judge did not abuse her discretion here.  The defendant

has presented no explanation, either at trial, in his motion for

a new trial, or on appeal, for why he could not have questioned

the witnesses who testified after the introduction of the

MassMutual footage and still images about the presence of

another person around the time of the crime and the

inconsistencies between the footage and the percipient

witnesses' testimony.[29]  Indeed, as the judge observed in denying

---

[29] The MassMutual footage and still images were introduced
through Springfield police Sergeant Roy Carter, who was
responsible for preparing and overseeing video evidence for the
Springfield police department.  Sergeant Carter went through the
images in his testimony and described what he saw in each one of
them.  Effective cross-examination of him could have revealed
discrepancies between the footage and the percipient witnesses'
testimony.  After Sergeant Carter, the Commonwealth called four

the motion for a new trial, the defendant engaged in vigorous cross- and recross-examination of both percipient witnesses. As discussed above, the defendant had access to the footage and was aware of its contents before trial. He was therefore not denied his constitutional right to confront the witnesses against him, or the opportunity to challenge the witnesses' credibility and the truth or accuracy of their testimony. See Commonwealth v. Miles, 420 Mass. 67, 71 (1995); Commonwealth v. Tanso, 411 Mass. 640, 650, cert. denied, 505 U.S. 1221 (1992).

Even if the judge had abused her discretion or otherwise erred in this ruling, there is no substantial likelihood of a miscarriage of justice. As the Commonwealth emphasizes, the defendant was free to present his interpretation of the MassMutual footage in his closing argument and to emphasize its inconsistencies with the percipient witnesses' testimony. See Commonwealth v. Murchison, 418 Mass. 58, 59-60 (1994). Indeed, the defendant emphasized a misidentification defense in his opening and closing statements and in his questioning of the Commonwealth's witnesses.

---

additional Springfield police officers who were involved in the case in varying respects and who could have been cross-examined regarding accounts of what had happened that night to demonstrate to the jury that there were inconsistencies in relation to the MassMutual footage. The defendant declined to cross-examine two of these witnesses.

We reach this conclusion fully aware that the defendant chose to represent himself at trial, with the assistance of standby counsel, and may not have had sufficient familiarity with the rules of criminal procedure and the permissible scope of cross-examination to put forth the strongest defense possible. However, a pro se criminal defendant is bound by the same substantive and procedural rules as attorneys. See Commonwealth v. Jackson, 419 Mass. 716, 719 (1995), citing Commonwealth v. Barnes, 399 Mass. 385, 392 (1987). Throughout trial, the defendant had the benefit of standby counsel and was encouraged by the judge to consult with him, which he did at all stages of the trial.[30] Where the defendant was deemed competent to represent himself by the judge after thorough inquiry,[31] see

---

[30] Prior to trial, the judge gave the defendant general guidance about his self-representation and assisted him in resolving an issue with access to his materials in the jail. In a few instances, standby counsel spoke on behalf of the defendant. Our review of the transcripts also suggests that the Commonwealth showed no signs of disrespect or ill-will toward the defendant and his decision to proceed pro se. See Commonwealth v. Jackson, 419 Mass. 716, 721 (1995) (Commonwealth did not take advantage of defendant's pro se status).

[31] Prior to trial, the defendant underwent a competency assessment, withstood a hearing, and engaged in a lengthy colloquy with the judge regarding his competency to stand trial and represent himself. The judge took the defendant's request to proceed pro se seriously but warned him of the disadvantages and challenges of self-representation, particularly in such a grave matter, and ensured that he understood the choice he was making. We are satisfied that the judge treated the defendant's voluntary waiver of counsel with appropriate care and caution. See Commonwealth v. Means, 454 Mass. 81, 89 (2009) ("judge must

Commonwealth v. Means, 454 Mass. 81, 89-90 (2009), and he chose to exercise his constitutional right to do so, we decline to find that any errors or inadequacies in that self-representation gave rise to a substantial likelihood of a miscarriage of justice. Such errors "were inherent in the risk he assumed." Jackson, supra at 721. To conclude otherwise would compromise the right to waive the "guiding hand of counsel" afforded by art. 12 of the Massachusetts Declaration of Rights. See id. at 719, quoting Powell v. Alabama, 287 U.S. 45, 69 (1932). See also Means, supra at 89.

c. False testimony.[32] Finally, the defendant asserts that the Commonwealth wrongly introduced the testimony of the percipient witnesses, Torres and Vazquez, when it knew that their testimony was false material evidence in light of the MassMutual footage. He claims, as discussed above, that the MassMutual footage demonstrates that Torres and Vazquez did not cross paths with the defendant at the time and place they said that they did, and that there is a person moving south in the footage at 3:12 A.M., according to the time stamp, while Torres and Vazquez were not in sight. Therefore, the defendant

_____

ensure by careful inquiry on the record" that waiver is made voluntarily and with understanding of magnitude of undertaking, and that defendant appreciates seriousness of charge and potential penalties).

[32] Appellate counsel disassociated himself from this argument, pursuant to Commonwealth v. Moffett, 383 Mass. 201, 217 (1981).

contends that the women lied in their descriptions of what happened that night, both in regard to their proximity to the defendant and to the absence of any other persons in the area. Further, the defendant contends that in viewing the footage in advance of trial, the Commonwealth was aware that Torres and Vazquez had committed perjury related to the sole material issue in the case, the identification of the perpetrator, because it objectively could have determined that their testimony was false from the MassMutual footage.

The Commonwealth may not present testimony at trial "which [it] knows or should know is false."  Commonwealth v. Sullivan, 410 Mass. 521, 532 (1991), S.C., ante 340 (2014), citing Napue v. Illinois, 360 U.S. 264, 269 (1959).  However, the Commonwealth need not "make an independent credibility determination as to each witness prior to presenting that witness."  Sullivan, supra.  As long as the Commonwealth has not acted improperly in procuring or presenting evidence, it may leave for the jury the determination whether a witness is telling the truth.  See id.

Where there is "evidence indicative of innocence in the form of documents, photographs, or other physically-verifiable items," which we are in as good a position to assess as the jury, we may make an exception to our general rule that we "look to the jury to weigh the identification testimony against the

evidence offered to support a defense."  Commonwealth v. Vaughan, 23 Mass. App. Ct. 40, 43 (1986).  We have reviewed the still images from the MassMutual footage and do not find that that they are so indicative of the defendant's innocence as to require our intrusion on the role of the jury.  See Commonwealth v. Barbosa, 463 Mass. 116, 132 (2012).

Nor are we persuaded that the testimony at issue was objectively false, as the defendant contends.  Torres and Vazquez were percipient witnesses who were in the immediate vicinity at the time of the crime and reported it to the police. The story told by the MassMutual footage is not sufficiently clear or contradictory that it would lead the Commonwealth to believe that the testimony from Torres and Vazquez regarding what they saw that night was false.  Minor inconsistences do not constitute falsities.  Such inconsistencies may be due to any number of factors, including confusion, the passage of time, or poor perception, see Commonwealth v. Daigle, 379 Mass. 541, 546-547 (1980), and they may be highlighted through cross-examination or rebuttal evidence.  There is no "requirement that evidence interlock with precision."  Commonwealth v. Nhut Huynh, 452 Mass. 481, 488 (2008).  An assessment of the credibility of the witnesses in relation to a reasonable interpretation of the documentary evidence was a proper task for the jury.  Id.  We therefore reject the defendant's contention that the

Commonwealth knowingly used false testimony that reasonably could have affected the judgment of the jury.  See <u>Napue</u>, 360 U.S. at 269; <u>Commonwealth</u> v. <u>Gilday</u>, 367 Mass. 474, 490 (1975).

3.  <u>General Laws c. 278, § 33E</u>.  We have reviewed the entire record and discern no reason to exercise our powers under G. L. c. 278, § 33E.  The judge was thoughtful and careful, cognizant that the defendant was proceeding pro se and appropriately suggesting that he consult with standby counsel on more difficult legal issues.

<u>Conclusion</u>.  In sum, we reject the defendant's evidentiary arguments and conclude that the judge's rulings before and during trial were sound.  Further, we discern no error in the admission of the MassMutual footage and the testimony of the percipient witnesses.  We affirm the defendant's conviction and the denial of his motion for a new trial.

<u>So ordered</u>.