Commonwealth *vs.* Michael Pleas.

No. 98-P-1204.

Suffolk. December 8, 1999. - June 6, 2000.

Present: Kass, Greenberg, & Beck, JJ.

*Identification. Evidence,* Identification, Opinion, Photograph, Videotape.

Discussion of Massachusetts [323-325] and Federal [325-328] criminal cases considering the admissibility of lay opinion testimony on the issue of identification.

In the circumstances of a criminal case in which the issue tried was the identification of the perpetrator, the judge properly admitted the testimony of a police officer identifying the defendant as the man shown in a videotape assaulting the victim in an automatic teller machine vestibule, where the photographic images were poor, where the police officer had a long social acquaintance with the defendant and his family, and where the defendant's appearance had changed since the time of the crime: the lay opinion of the witness could be helpful to the jury and its probative value outweighed any prejudicial effect. [328-329]

Indictments found and returned in the Superior Court Department on April 23, 1997.

The cases were tried before *Thomas E. Connolly*, J.

*Douglas J. Beaton* for the defendant.

*Christopher Pohl*, Assistant District Attorney, for the Commonwealth.

Kass, J. Michael Pleas, the defendant, was convicted by a Superior Court jury of unarmed robbery, G. L. c. 265, § 19, and assault and battery, G. L. c. 265, § 13A. The sole issue on appeal is whether the trial judge erred in allowing a police officer to testify as a lay witness that one of the people shown on the bank surveillance videotape robbing and assaulting the victim was the defendant. We affirm.

1. *Facts.* Evidence presented at trial warranted the jury's finding the following facts. On her way home from work shortly after 11:00 P.M. on March 31, 1997, the victim stopped at a

BankBoston automated teller machine (ATM) vestibule on Huntington Avenue in Boston. As she was making a withdrawal, the victim heard a buzzer, signifying that the door to the vestibule had opened, and saw a man and a woman enter the vestibule. The woman walked up to the victim and said, "Excuse me, miss." As the victim turned toward her, the man grabbed the victim from behind and told her that he would break her neck if she did or said anything. Nonetheless the woman struggled, and both landed on the ground.

As the victim lay belly down, the male assailant kicked her and took from her the ten dollars she had just withdrawn, her wallet, and her backpack. The woman assailant grabbed the victim's ATM card and repeatedly demanded the PIN code.[1] Initially, the victim gave out incorrect codes, hoping that the ATM would confiscate her card. Even as the robbers' frustration mounted, a second man entered the vestibule. To this potential rescuer the victim made a plea for help. The second man told her to shut up and pushed her; he was in league with the other two. With hopes for rescue dashed, and having been repeatedly hit and kicked, the victim surrendered and provided the correct PIN, which she typed into the ATM herself. The woman robber then stepped to the machine and, in a series of transactions, withdrew $430 from the victim's account.[2] Cash in hand, the robbers left, the victim called for help at a pay phone, and police showed up. The victim described the man who had attacked her from behind as about 5'4" or 5'5" tall (about two and one-half inches shorter than she is), and wearing a knitted ski cap pulled down to his eyebrows and a black coat buttoned to his neck.

On November 25, 1997, some eight months after the attack and robbery, Detective Thomas Famolare of the Boston police department showed the victim a photo array of nine similar-looking men. The victim was unsure which, if any, of the men had attacked and robbed her in March, but stated that the second

---

[1]To access one's bank account using an ATM, it is necessary to enter a personal identification number, or PIN, on the ATM key pad.

[2]Five transactions involving the victim's account occurred after her initial withdrawal of $10: at 11:20 P.M., $100 was withdrawn; $200 at 11:21 P.M.; $30, again at 11:21 P.M.; an attempt to withdraw $200 at 11:22 P.M. did not go through because it was over the account's limit; and a final, successful withdrawal of $100 was made at 11:23 P.M.

man in the array looked like her first assailant.[3] Explaining her uncertainty, she testified that viewing the array was difficult because the assault had been traumatic — she had since blocked certain aspects of it from her memory — and she had not caught more than a glimpse of the man who attacked her from behind because she had been lying face down on the floor. The main issue at trial was the identity of the first male assailant in the videotape. Was he the defendant? After the victim testified, the Commonwealth showed the jury the black and white, time-lapse videotape of the incident. (The videotape was a series of still photographs, taken by a number of differently positioned cameras in the vestibule at several-second intervals.) Additionally, the Commonwealth introduced a number of thermal image prints and eight Polaroid photographs made from the videotape. The quality of photographic evidence was poor, and the Commonwealth, therefore, offered the testimony of Roque Heath, a Boston police officer, that the person seen in the surveillance videotape attacking the victim was the defendant. To that end, the government filed a pretrial motion in limine, which the trial judge allowed after conducting a voir dire of Officer Heath.

Officer Heath testified that he had known the defendant and his family socially for nine to ten years, having met and spoken with the defendant on many occasions prior to March, 1997. Officer Heath testified that after he was shown one of the pictures from the bank surveillance camera — which depicted a man holding the victim from behind by her neck — he had recognized the assailant as the defendant. Officer Heath then identified the defendant in court.

2. *Discussion.* Massachusetts allows the admission of lay opinion testimony on identification in certain circumstances. In *Commonwealth* v. *Vitello*, 376 Mass. 426 (1978), the court held that a police officer's testimony could "aid the jury in determining if the person whose picture had been taken sometime in the past was the same person who sat in the court room as the defendant." *Id.* at 460. There, the defendant's appearance had changed since the time of the robbery and the victim, although he had previously identified the defendant from a photograph as the robber, did not recognize the defendant as he appeared at trial. In that setting, a police officer, who had known the defendant for a long time and had seen him often, was allowed

---

[3]The defendant was number five in the array.

to testify that the man the victim had identified in the photograph was the defendant. *Id.* at 458, 460.

Similarly, in *Commonwealth* v. *Gagnon*, 16 Mass. App. Ct. 110 (1983), *S.C., Commonwealth* v. *Bourgeois*, 391 Mass. 869 (1984), an investigating officer familiar with the defendants at the time they were arrested was permitted to testify that it was the defendants who were captured on film by the Shawmut First Bank's security camera. *Id.* at 127. Important to the admission of the testimony was that, between the time the photographs were taken and the time of trial, the defendants had altered their appearances. *Ibid.*

By no means do our cases always admit lay opinion testimony on identification. In *Commonwealth* v. *Austin*, 421 Mass. 357 (1995), the court held it error to admit the lay opinion identification testimony of a police officer that the man depicted in a surveillance videotape was the defendant. *Id.* at 365-366. The court reasoned that the testimony was improperly admitted because the jurors were capable of drawing that conclusion themselves, but any error was deemed harmless, as the evidence against the defendant was deep and the officer's testimony was cumulative. *Id.* at 366. Similarly, in *Commonwealth* v. *Nassar*, 351 Mass. 37 (1966), the court held it error for the prosecutor to comment in his opening remarks that a police officer thought a composite sketch of the suspect resembled a photograph of the defendant. *Id.* at 41-42. Again, the court stated that the jury had both the composite and the photograph and could make the comparison for themselves. *Id.* at 42. See *Commonwealth* v. *Anderson*, 19 Mass. App. Ct. 968, 969 (1985) (error to admit testimony absent considerations present in *Vitello*, but harmless because of "overwhelming" evidence before jury).

In determining whether to admit lay opinion testimony on identification, opinions often turned to the venerable, if somewhat nebulous, test set forth in *Commonwealth* v. *Sturtivant*, 117 Mass. 122, 137 (1875):

> "The competency of this evidence rests upon two necessary conditions: first, that the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time; and second, that the facts upon which the witness is called to express his opinion, are such as men in general are capable of comprehending and understanding."

Proposed Massachusetts Rule of Evidence 701, which is identical to the corresponding Federal rule, puts the matter somewhat differently:

> "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue."

Although not adopted, "[t]he Proposed Rules have substantial value as a comparative standard in the continued and historic role of the courts in developing principles of law relating to evidence." Supreme Judicial Court, Announcement Concerning the Proposed Massachusetts Rules of Evidence (Dec. 30, 1982).

Federal courts determining the admissibility of testimony on the identification of individuals depicted in surveillance pictures look to a number of factors. The quality of the photographic images matters; if they are neither "so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification," then lay opinion testimony may be admitted. *United States* v. *Jackman*, 48 F.3d 1, 5 (1st Cir. 1995). See *United States* v. *Wright*, 904 F.2d 403, 405 (8th Cir. 1990) (allowing testimony where "[t]he picture taken of [the defendant] as he removed his mask was not a model of clarity").

The level of familiarity of the witness with the person shown in the photograph is also a factor. See, e.g., *United States* v. *Barrett*, 703 F.2d 1076, 1085-1086 (9th Cir. 1983) (witness was defendant's girlfriend); *United States* v. *Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984) (one witness had met with the defendant at least seventy-five times; another about twenty times); *United States* v. *Wright, supra* at 405 ("[E]ach witness had seen Wright numerous times over an extended period of time"); *United States* v. *LaPierre*, 998 F.2d 1460, 1465 (9th Cir. 1993) (error to admit testimony where witness did not know defendant and had never seen him in person); *United States* v. *Jackman, supra* at 6-7 (witnesses had known the defendant for a long time and had seen him on many occasions); *United States* v. *Pierce*, 136 F.3d 770, 775 (11th Cir.), cert. denied, 525 U.S. 974 (1998) ("[B]oth . . . witnesses had

become familiar with Pierce's appearance and . . . his facial features through repeated contacts with [him] over significant periods of time"). Cf. *United States* v. *Jackson*, 688 F.2d 1121, 1123, 1125 (7th Cir. 1982), cert. denied, 460 U.S. 1043 (1983) (admitting testimony even though witness had seen defendant only once before, but holding that the opportunity to observe the defendant goes to the weight, not the admissibility, of the testimony); *United States* v. *Allen*, 787 F.2d 933, 935-936 (4th Cir. 1986), vacated on other grounds, 479 U.S. 1077 (1987) (same, but witnesses had known defendant for some time).

The courts also consider whether the defendant is disguised in the photograph or has changed his appearance since the time of the crime. See, e.g., *United States* v. *Ingram*, 600 F.2d 260, 261 (10th Cir. 1979) (defendant's appearance had changed between time of the robbery and time of trial); *United States* v. *Borrelli*, 621 F.2d 1092, 1095 (10th Cir.), cert. denied, 449 U.S. 956 (1980) (defendant had changed hairstyle and grown a moustache); *United States* v. *Barrett*, *supra* at 1086 (defendant appeared clean-shaven at trial); *United States* v. *Farnsworth*, *supra* at 1160 (defendant had grown a full beard and the day of the robbery had worn a scarf over his face); *United States* v. *Lucas*, 898 F.2d 606, 610 (8th Cir.), cert. denied, 498 U.S. 838 (1990) (defendant appeared clean-shaven at trial); *United States* v. *Towns*, 913 F.2d 434, 445 (7th Cir. 1990) (defendant had worn stocking cap, sunglasses, and bulky clothing to the robbery); *United States* v. *Ellis*, 121 F.3d 908, 927 (4th Cir. 1997), cert. denied, 522 U.S. 1068 (1998) (defendants were wearing masks and hooded sweatshirts). Cf. *United States* v. *LaPierre*, *supra* at 1465 (holding it error to admit testimony where, among other things, there was no evidence that defendant's appearance had changed since the time of the robbery).

These factors — the condition of the surveillance pictures, the familiarity of the witness with the person's appearance at the time the picture was taken, and whether the person was disguised or has since altered his appearance — distill to the following: "A witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *United States* v. *Farnsworth*, *supra* at 1160. Put another way, "such testimony is admissible . . . when the witness possesses sufficiently relevant familiarity with the

defendant that the jury cannot also possess . . . ."[4] *United States* v. *Jackman, supra* at 4-5.

Even if those factors are present, the Federal courts will not admit the testimony if its prejudicial effect outweighs its probative value. Most often, that issue arises when the State calls a police or parole officer as a lay identification witness. In many instances, the trial court is careful to keep the witness's occupation from the jury to minimize any prejudicial effect that information might have. See, e.g., *United States* v. *Farnsworth, supra* at 1160; *United States* v. *Allen, supra* at 935; *United States* v. *Wright, supra* at 404; *United States* v. *Stormer*, 938 F.2d 759, 760-761 (7th Cir. 1991). In these cases, the courts have held that the probative value of the testimony outweighed any prejudicial effect and also that any limitation on cross-examination resulted from a tactical decision by the defendant. But see *United States* v. *Calhoun*, 544 F.2d 291, 295 (6th Cir. 1976) (reversing because parole officer, whose occupation was not identified to the jury, could not be adequately cross-examined).

Identification testimony from a police officer who is so designated increases the potential for inappropriate prejudice to the defendant. For example, in *United States* v. *Sostarich*, 684 F.2d 606 (8th Cir. 1982) (per curiam), the Court of Appeals for the Eighth Circuit held that it was error for the prosecutor to elicit from the identification witness that he knew the defendant because he had been incarcerated with him for several years. *Id.*

---

[4]States whose rule on the admissibility of lay opinion testimony is the same as the Federal rule (and the proposed Massachusetts rule) have admitted lay opinion testimony on identification using the same analysis and considerations as the Federal courts. See *Robinson* v. *People*, 927 P.2d 381, 384 (Colo. 1996) ("[A] lay witness may testify regarding the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury"); *Harper* v. *State*, 213 Ga. App. 444, 448 (1994) (witnesses were "able to observe the defendant at the time of the robbery before his appearance had changed"); *Gibson* v. *State*, 709 N.E.2d 11, 15 (Ind. Ct. App. 1999) (witness had known defendant since childhood); *State* v. *Miller*, 741 A.2d 448, 451-452 (Me. 1999) (witnesses had known defendant for at least several years and could testify to his appearance at the time of the crime); *Rossana* v. *State*, 113 Nev. 375, 380-381 (1997) (per curiam) (witnesses knew defendant at time of the crime; defendant's appearance had substantially changed); *State* v. *Hardy*, 76 Wash. App. 188, 191 (1994), aff'd sub nom. *State* v. *Clark*, 129 Wash. 2d 211 (1996) (witness had known defendant for several years; videotape was "somewhat grainy").

at 608. More frequently, however, the association is not nearly as damaging as that in *Sostarich*. Oftentimes, in upholding the admission of the testimony, the court notes that the jury never heard of any prior arrests or convictions of the defendant. See *United States* v. *Butcher*, 557 F.2d 666, 669 (9th Cir. 1977). Although the witness may have identified himself as a police officer, his testimony involving his acquaintance with the defendant would consist only of how long he had known the defendant and how frequently he saw him during the relationship. See, e.g., *United States* v. *Henderson*, 68 F.3d 323, 324 (9th Cir. 1995).

In the instant case, Officer Heath testified about his service as a member of the Boston police department, that he had known the defendant socially for nine to ten years, that he had met the defendant's mother and had been to a barbecue at his house. There was no evidence admitted suggesting that he knew the defendant because of the defendant's prior adversarial encounters with law enforcement authorities. Officer Heath then identified the defendant as the man who in the videotape picture puts a choke hold on the victim from behind and then wrestles her to the ground. When asked if the defendant had since changed his appearance, Officer Heath testified that the defendant, who wore glasses in court, had never worn glasses on the previous occasions when he met him. It would have been better practice not to have Heath identify himself as a police officer. The basis for allowing Heath to identify the defendant from the videotape pictures was that he knew him so well he could recognize even a photograph in which the face was partially obscured. Here, that acquaintance was social; it was not based on Health's police work. Identifying Heath as a policeman ran an avoidable risk of introducing an undesirable overtone, namely, that the defendant had a history with the police.

Nonetheless, we decide that the trial judge acted within his discretion in admitting Officer Heath's identification of the defendant as the man shown in the videotape placing an armlock around the neck of the victim because (1) the image in the videotape and the prints made from it were of poor quality although not "hopelessly obscure"; (2) Heath had long familiarity with the defendant that enabled him to identify an indistinct picture of the defendant; (3) there was some change in the appearance of the defendant at trial and as he generally presented in everyday life outdoors; and (4) the acquaintanceship of Heath

with the defendant, as it was presented to the jury, was social rather than tied to Heath's duties as a police officer. Taking those factors into account, Heath's testimony could be helpful to the jurors, who, of course, still had before them the videotape and the still prints made from it.

*Judgments affirmed.*