NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-1380                                        Appeals Court

COMMONWEALTH  vs.  NICHOLAS MATOS.

No. 17-P-1380.

Bristol.     December 10, 2018. - May 23, 2019.

Present:  Green, C.J., Wolohojian, & Wendlandt, JJ.


Robbery.  Assault and Battery.  Identification.  Evidence,
    Identification, Photograph, Argument by prosecutor.
    Practice, Criminal, Identification of defendant in
    courtroom, Instructions to jury, Witness, Argument by
    prosecutor.



    Indictments found and returned in the Superior Court
Department on May 21, 2015.

    The cases were tried before Thomas F. McGuire, Jr., J.


    K. Hayne Barnwell for the defendant.
    Stephen C. Nadeau, Jr., Assistant District Attorney, for
the Commonwealth.


    WOLOHOJIAN, J.  The defendant was convicted after a jury

trial of unarmed robbery (G. L. c. 265, § 19 [b]) and assault

and battery (G. L. c. 265, § 13A).  On appeal, he argues that

evidence he terms in-court and out-of-court identifications was

erroneously admitted.  He also contends that the judge erred in failing to give a specific unanimity instruction with respect to the unarmed robbery charge.  Finally, he contends that various improprieties in the prosecutor's closing argument require reversal of his convictions.  We affirm.

Background.  We summarize the trial evidence as the jury could have found it.  Around 5:30 P.M. on March 2, 2015, Michael Nichols was sitting inside the main entrance of Morton Hospital in Taunton, having completed his shift as a technician at the hospital, where he had worked for eighteen years.  Nichols, who did not drive, was waiting for a taxicab (taxi) to take him to a bar where his pool league was to meet.  Nichols had several items with him on that particular evening:  a carrying case containing his pool stick, his cell phone (phone), and a backpack that contained various personal items, including his checkbook.  As he waited for the taxi, Nichols was approached by a white man of medium build with a darker complexion who was wearing a red hat, a black North Face brand jacket, and blue jeans.  Nichols did not know the red-hatted man, but he nonetheless agreed to the man's request to borrow his phone. The man took the phone outside and returned a few minutes later, saying that he had left the phone in his car.  The man also told Nichols that Nichols should follow him to his car in the parking lot to get the phone back.  Accordingly, Nichols followed the

man to his car, which was one to two hundred feet away in the hospital parking lot. The man offered to drive Nichols back to the hospital entrance, and so Nichols got into the man's car. Leaving Nichols in the car, the man went inside the hospital; he returned about five minutes later with two other men, who got into the rear passenger compartment of the car. Nichols asked for his phone, but the red-hatted man made no response. Instead, he drove a block away from the hospital and demanded Nichols's backpack. When Nichols refused, the red-hatted man punched Nichols twice in the nose and grabbed one of the straps of the backpack to restrain Nichols. Nichols managed to slip his arms out of the backpack and to escape from the car. The man drove away with Nichols's backpack, phone, and pool stick case.

A police officer happened to be nearby, and Nichols immediately reported to him the assault and robbery along with the car's license plate number and a description of the men involved. Nichols was visibly upset and shaken, his nose was bleeding, blood was running down his face, and his lip was swollen. Using the license plate number Nichols provided, the police determined that the car was registered to the defendant's girlfriend. The police then went to the hospital, where they viewed video footage captured by the hospital's surveillance

system.    Still images from the hospital's surveillance system[1]

were consistent with Nichols's account of what had happened.

Those stills showed Nichols seated in the hospital lobby, a man

approaching him wearing a red hat,[2] Nichols (wearing his backpack

and carrying his pool stick case) following a man in the

hospital parking lot, a man in a red hat standing near the

hospital's main lobby desk a few minutes later, and that same

man joined by another man wearing a gray hooded coat, black

sneakers, and white baseball cap with a "P" insignia on front.

The following day, Taunton police arrested Jeremy Craven

and Matthew DaSilva for shoplifting at a department store.  In

Craven's pocket was Nichols's checkbook.  DaSilva was wearing a

gray hooded sweatshirt and a baseball hat with a "P" insignia

similar to those worn by the man standing with the red-hatted

man in the hospital lobby.  The defendant was arrested several

days later at his girlfriend's apartment.

---

[1] The hospital's surveillance equipment captured video
footage, which the police viewed on the evening of the crime.
But based on an internal policy concerning patient and employee
confidentiality, the hospital produced to police only still
images from the video recording.  It was these still images that
were used during the trial and the grand jury proceedings.

[2] Although this information was not admitted at trial, one
of the investigating police officers recognized the defendant as
the red-hatted man in the hospital surveillance video
recordings.

Discussion. 1. Identifications. Because Nichols did not know his assailant, the identity of the man in the red hat was the central issue at trial. Although the defendant identified the man in the red hat in the surveillance still images as the man who assaulted and robbed him, he never identified the red-hatted man as the defendant. As a result, the Commonwealth sought to establish that the defendant was the man in the red hat (1) by having the jury themselves assess the defendant's resemblance to the man shown in the still images (which were admitted), (2) through the testimony of the defendant's mother, who testified that the man in the red hat shown in the still images was her son, the defendant, (3) through the testimony of the arresting officer, who identified the defendant as the man he arrested and as the man in the booking photograph, and (4) through circumstantial evidence, such as the fact that the vehicle used in the crime belonged to the defendant's girlfriend. Because Nichols had never made an out-of-court identification of the defendant, the trial judge agreed with the defendant that Nichols should not be allowed to make an in-court identification of the defendant. See Commonwealth v. Crayton, 470 Mass. 228, 236-237, 241-242 (2014). The defendant now contends, however, that several "identifications" nonetheless occurred.

a.  Surveillance images.  The first of these "identifications" was introduced by defense counsel, who introduced the portion of Nichols's grand jury testimony where Nichols was shown two of the still images from the hospital's security system.[3]  The first still image showed a man at the hospital's entrance who fit Nichols's description of the red-hatted man; the image was recorded when Nichols was waiting outside in the man's car.  Nichols identified the man as the person who borrowed his phone.  The second image showed the hospital entrance twelve minutes earlier, with both Nichols and the man in the frame.[4]  Nichols testified to the grand jury that the image showed the same man when the man asked to borrow his phone.  The defendant contends that there was no good reason to conduct this showup identification or photographic (photo) array, that it was impermissibly suggestive, and that Nichols should not have been allowed to testify to this identification at trial.

Showup identifications are one-on-one identification procedures in which a victim or witness is asked to identify a

---

[3] Nichols had not previously seen the still images.

[4] By contrast, at trial Nichols was first shown the two surveillance photographs where both he and the red-hatted man were present, and then was shown the photograph containing just the red-hatted man.  The order in which the photographs were shown to Nichols avoids any claim that there was a "one-on-one" identification process.

suspect (usually in person) in the immediate aftermath of the crime, often near or at the scene. See Commonwealth v. Dew, 478 Mass. 304, 306-307 (2017). No such procedure occurred here. Nor was Nichols shown a photo array as the defendant claims. A photo array is a procedure by which a victim or witness is asked to identify a suspect from among a series of photographs showing similar-looking people. See generally Commonwealth v. Silva-Santiago, 453 Mass. 782, 794-796 (2009) (procedures regarding photo arrays). Again, no such process occurred here.

Nonetheless, we accept arguendo the defendant's proposition that when questioning Nichols before the grand jury, the prosecutor engaged Nichols in a process "analogous to a one-on-one identification" when she asked him whether he recognized the man in the first still image, i.e., the one that showed only the man in the red hat. Commonwealth v. Forte, 469 Mass. 469, 477 (2014). "An identification stemming from a videotape containing only one individual is analogous to a one-on-one identification, which is considered inherently suggestive." Id. To suppress this identification, the defendant is required to prove "by a preponderance of the evidence, in light of the totality of the circumstances, that the identification procedure employed was 'so unnecessarily suggestive and conducive to irreparable misidentification that its admission would deprive the defendant of his right to due process.'" Id., quoting Commonwealth v.

Walker, 460 Mass. 590, 599 (2011). This, the defendant has not done.

To begin, we note that the defendant has not pointed us to (nor have we found) any case standing for the proposition that asking a witness to identify him- or herself in a photograph is unduly suggestive, even if the witness is the only person in the image. The risk of misidentifying one's own self in a photograph seems so small as to verge on the hypothetical and, in any event, absent other circumstances, is unlikely to be the product of any suggestiveness inherent in the process of showing an image depicting only one person.

As a corollary, we believe that asking a witness to identify him- or herself in a photograph that happens to include another person also does not raise concerns of unnecessary suggestiveness absent some other circumstance. Nor does asking the witness to identify the other person shown in such an image raise such concerns. In all of these situations, absent some other circumstance, the presence of the witness him- or herself in the image helps to protect against any suggestiveness that otherwise inheres in a single-person identification process. This is especially true where, as here, an image captures the witness in the moment when he or she is the victim of a crime and the events experienced by the witness during the crime are shown in the photograph. Contrast Forte, 469 Mass. at 473-474

(witnesses shown videotape depicting suspect walking alone);
Commonwealth v. Austin, 421 Mass. 357, 361 (1995) (witnesses
shown videotape of robbery suspect committing different
robbery); Commonwealth v. Carlson, 92 Mass. App. Ct. 710, 712
(2018) (witness was shown one photograph of one man he knew was
suspect).

Moreover, other circumstances undermine the defendant's
claim that the procedure was unnecessarily suggestive. For
example, Nichols gave a detailed description of his assailant
and of the events at issue long before he was shown the still
images, and the images merely confirmed what Nichols had
previously told police. Likewise, seeing the still images did
not prompt any additional information from Nichols; he merely
confirmed that the photographs showed events and people he had
previously described. As we stated above, Nichols did not
identify the defendant from the photograph.

b. Lay identification testimony. The defendant challenges
the admission of his mother's lay opinion that he was the red-
hatted man in the surveillance images on the ground that the
jury were in as good a position as his mother to determine
whether he was the person captured in the images.[5] A witness may

_____

    [5] The defendant also argues that his mother's identification
was prejudicial because of her potential bias against him. He
did not raise this contention below, nor was the record
developed regarding any potential bias. See Commonwealth v.

offer a lay opinion as to the identity of a person depicted in a surveillance photograph "if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.  Put another way, 'such testimony is admissible . . . when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess.'"  Commonwealth v. Vacher, 469 Mass. 425, 441 (2014), quoting Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 326-327 (2000).  See Commonwealth v. Pina, 481 Mass. 413, 429-430 (2019); Mass. G. Evid. § 701 (2019).  Relevant factors to consider include whether "[the images] are neither 'so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification'" and "whether the defendant is disguised in the photograph or has changed his appearance since the time of the crime."  Pleas, supra at 325, 326, quoting United States v. Jackman, 48 F.3d 1, 5 (1st Cir. 1995).  See Commonwealth v. Pearson, 77 Mass. App. Ct. 95, 105 (2010).  We review the judge's decision to allow the mother to offer her lay opinion as

---

Burnett, 428 Mass. 469, 475-476 (1998) (party may not raise ground on appeal that was not raised before motion judge). Indeed, at the hearing on the Commonwealth's motions in limine, the defendant specifically requested that his "history" with his mother be omitted, indicated that he did not expect the nature of the relationship to "interfere" with the mother's testimony, and said that he would have no follow-up questions after she identified her son.

to the identity of the person in the surveillance images for abuse of discretion.  See Pleas, supra at 328.

The defendant does not challenge his mother's familiarity with his appearance, nor that her familiarity was greater than the jury's.  His contention, instead, is that the surveillance images were sufficiently clear that the jury needed no assistance to determine whether the defendant was the red-hatted man depicted in them.  Having reviewed the images ourselves, we see no error in the judge's determination that, although the images are moderately clear, they were not "unmistakably clear," id. at 325, as to the red-hatted man's features such that the mother's lay opinion threatened to "invade[] the province of the jury to draw their own conclusions about who is who."  Pina, 481 Mass. at 430.  In addition, the defendant has not shown that the judge erred in finding that the defendant's appearance at trial was different from his appearance at the time of the crime and that the mother's testimony would for that reason also be helpful to the jury.[6]

c.  Identification as person arrested and shown in booking photograph.  The defendant challenges the arresting officer's

---

[6] The judge found that the defendant had less facial hair at the time of trial, and such finding has not been shown to be clearly erroneous; the defendant has not supplied a photograph of his appearance at trial.

in-court identification of the defendant as the man he arrested and in the booking photographs.  The defendant argues that the prejudicial effect of this testimony outweighed its probative value because the jury could conflate the officer's identification of the defendant as the man he arrested with the identity of the man who actually committed the crimes.  He also argues that the booking photographs should have been excluded because the prosecutor called attention to their source and there was no need to introduce them.  Because these arguments were not preserved,[7] we consider whether any error (if one there were) created a substantial risk of a miscarriage of justice.  Commonwealth v. Clemente, 452 Mass. 295, 322 (2008), cert. denied, 555 U.S. 1181 (2009).

There was no error in allowing the officer to identify the defendant in court as the man he arrested.  See Crayton, 470 Mass. at 242 (even where "an arresting officer . . . was also an eyewitness to the commission of the crime, . . . the in-court showup is understood by the jury as confirmation that the defendant sitting in the court room is the person whose conduct is at issue rather than as identification evidence").  The jury knew that the officer was not an eyewitness to the crime and had no firsthand knowledge of the perpetrator's identity.  It was

---

[7] At trial, the defendant objected to the booking photographs only on the ground that they lacked probative value.

clear that the purpose of the officer's testimony was merely to show that the defendant was both the man the officer arrested and the man in the booking photographs. The officer did not testify that the defendant committed the crimes.

A judge has substantial discretion in balancing the probative value and prejudicial impact of the booking photographs and the judge's decision "will stand absent palpable error." Commonwealth v. Talbot, 444 Mass. 586, 589 n.2 (2005). By the time of trial, the defendant, a young adult, had aged almost two years since the surveillance images were recorded and, as the judge found, had less facial hair than the man in the surveillance photographs. The booking photographs were relevant because they showed the defendant's appearance only one week after the crime. They thus bore squarely on the central question for the jury: was the defendant the red-hatted man shown in the surveillance images? See Commonwealth v. Holmes, 32 Mass. App. Ct. 906, 909 (1992) (photographs showing defendant's appearance at time of incident "admissible on the question of identification -- a live issue at the trial").

Because "[t]he jury knew that the defendant had been arrested for the crime[s] being tried," Commonwealth v. Waters, 399 Mass. 708, 715 (1987), the probative value of the photographs was not outweighed by the fact that the jury were informed that they were taken at the defendant's booking.

Unlike situations where the Commonwealth seeks to use a mugshot from an earlier encounter with police, where (as here) the photographs are taken in connection with the defendant's arrest for the crimes being tried, no criminal record is suggested.[8] See Commonwealth v. Vardinski, 438 Mass. 444, 453 n.13 (2003); Commonwealth v. Andrade, 8 Mass. App. Ct. 653, 658 (1979).

2. Specific unanimity. The defendant argues that the jury should have received a specific unanimity instruction for the unarmed robbery charge because there was more than one act of taking of property (the initial taking of the phone and the later takings of the backpack and pool stick).[9] "[A] specific unanimity instruction indicates to the jury that they must be unanimous as to which specific act constitutes the offense charged," Commonwealth v. Keevan, 400 Mass. 557, 566-567 (1987), and is needed "where evidence of separate incidents is offered

---

[8] Such a risk, by contrast, accompanies the use of photographs taken in connection with earlier arrests or police encounters. See Commonwealth v. Blaney, 387 Mass. 628, 637-638 (1982) ("There is risk that any use in evidence of photographs of the double type ordinarily used in police identification files will suggest to the jury that the defendant may have a prior criminal record. . . . Accordingly, the decisions of this court have required judges and prosecutors to use reasonable means to avoid calling the jury's attention to the source of the photographs used to identify the defendant" [quotation and citation omitted]). See also Mass. G. Evid. § 1112(b)(1)(C).

[9] The defendant did not raise this issue below, so we review for error, and if one occurred, for a substantial risk of a miscarriage of justice. See Commonwealth v. Freeman, 352 Mass. 556, 563-564 (1967).

to the jury and any one incident could support a conviction," Commonwealth v. Conefrey, 420 Mass. 508, 513 (1995).

Here, the jury had before it facts supporting only one incident of unarmed robbery, which requires taking property from someone's person or control "by force and violence, or by assault and putting in fear."  G. L. c. 265, § 19 (b).  The evidence was unequivocal that Nichols was not assaulted, put in fear, or the subject of force or violence until he was in the perpetrator's car and the perpetrator demanded his backpack and punched him.  Nor was the case tried on any other theory. Contrast Commonwealth v. Grandison, 433 Mass. 135, 147 (2001).

3.  Closing argument.  The defendant argues that three aspects of the prosecutor's closing argument, individually and collectively, require a reversal of his convictions.  "In analyzing a claim of improper argument, the prosecutor's remarks must be viewed in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.'"  Commonwealth v. Lamrini, 392 Mass. 427, 432 (1984), quoting Commonwealth v. Bourgeois, 391 Mass. 869, 885 (1984). As the defendant objected at trial, we review for prejudicial error.  See Commonwealth v. Roy, 464 Mass. 818, 829 (2013).  If prosecutorial error occurred,

> "[t]he consequences . . . depend on a number of factors, such as:  Did the defendant seasonably object to the argument?  Was the prosecutor's error limited to

> 'collateral issues' or did it go to the heart of the case
> . . . ?  What did the judge tell the jury, generally or
> specifically, that may have mitigated the prosecutor's
> mistake, and generally did the error in the circumstances
> possibly make a difference in the jury's conclusions? . . .
> On numerous occasions, the impact of an improper final
> argument has been mitigated by the judge's forceful
> instructions to the jury that the argument was
> inappropriate and should be disregarded."  (Footnote
> omitted.)

Commonwealth v. Kozec, 399 Mass. 514, 518 (1987).  We turn now to the three specific aspects of the closing to which the defendant points.

The defendant argues that the prosecutor impermissibly argued that key elements and facts supporting the prosecution's case were undisputed.[10]  We agree.  The defendant had no burden to disprove the Commonwealth's evidence or to contradict its witnesses' testimony; the burden always remains with the Commonwealth, whether or not the defendant disputes the Commonwealth's evidence.  See Commonwealth v. Waite, 422 Mass. 792, 801 (1996) ("Defendants are, of course, under absolutely no

---

[10] The prosecutor stated:  "There is no dispute that Michael Nichols was in the lobby of that hospital on March 2nd, 2015. And I also suggest there's no dispute the defendant was in that same lobby of the hospital and that the defendant went up to Michael as Michael was sitting waiting for the cab.  And the still photos show you that.  I suggest there is no dispute that Michael was assaulted, punched twice in the face, and that he was robbed of his personal property.  The only question you have to ask yourselves is who did it."  The prosecutor later repeated, "Now, remember, the only issue you need to consider is who punched Michael and who robbed him of his personal property."

obligation to disprove government accusations . . .");
Commonwealth v. Amirault, 404 Mass. 221, 240 (1989) ("A
prosecutor cannot comment on a defendant's failure to contradict
testimony and cannot make statements that shift the burden of
proof from the Commonwealth to the defendant"); Mass. G. Evid.
§ 1113(b)(3)(E).  However, the judge gave a forceful and
specific instruction to remediate the error,[11] and gave extensive
general instructions on the presumption of the defendant's
innocence, the burden of proof, and what constitutes a proper
evidentiary basis for a verdict.  This mitigation, together with
the overwhelming strength of the Commonwealth's case, leads us
to conclude "with fair assurance" that the prosecutor's error
did not "substantially sway[]" the jury's decision (citation
omitted).  Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).

The defendant also argues that the prosecutor engaged in
impermissible vouching.  Specifically, the defendant points to
the portion of the prosecutor's closing in which she raised (and
then answered) a number of questions regarding hypothetical

---

[11] The judge instructed the jury:  "Counsel began by saying
that there is no dispute about certain things.  That's improper
argument, and I understand sometimes lawyers lapse into that
phrasing, intending to talk about what the focus was on in the
evidence; but it's improper, because it might mislead the jury
into thinking that the Commonwealth has been relieved of its
burden of proving certain things.  Everything is in dispute
. . .  [K]eep in mind everything is in dispute in this case."

scenarios designed to show why Nichols was telling the truth.[12]
Taken in context, and keeping in mind that the defendant's
closing argument focused largely on Nichols's credibility, the
prosecutor's comments did not constitute impermissible vouching.
"A prosecutor is permitted to 'make a fair response to an attack
on the credibility of a government witness.'" Commonwealth v.
Smith, 450 Mass. 395, 408, cert. denied, 555 U.S. 893 (2008),
quoting Commonwealth v. Chavis, 415 Mass. 703, 713 (1993).

Finally, the defendant argues that the prosecutor's
statements that it was the defendant who asked to borrow
Nichols's phone, invited Nichols to his car, drove Nichols away
from the hospital, and assaulted and robbed Nichols were not
grounded in the evidence. Although "prosecutor[s] may not
misstate evidence or refer to facts not in evidence in a closing

---

[12] The prosecutor stated: "Ask yourselves why would Michael
[Nichols] lie to make this up? What would be the reason to lie?
Well, maybe a person would lie if he didn't like the other
person, or if he had an issue with the other person, if he
wanted to get back at someone. But that doesn't apply here,
because Michael doesn't know the defendant. He didn't know the
two men in the back seat. So he has no reason to lie or make up
about what happened to him. Now, maybe a person would lie to
protect somebody, but again, Michael doesn't know them. So he
has no reason to protect anybody. Maybe a person would lie
because they were afraid, but Michael had gotten out of the car,
away from all three of them. He wasn't in danger anymore.
Maybe a person would lie if he had something to hide. But if
Michael had something to hide, would he have immediately gone to
the police for help? That is the first thing he did. . . . Who
do you believe? . . . Michael who[se] testimony, I suggest, was
credible in every way?"

argument," <u>Commonwealth</u> v. <u>Goddard</u>, 476 Mass. 443, 449 (2017), they are entitled "to marshal the evidence and suggest inferences that the jury may draw from it." <u>Commonwealth</u> v. <u>Drayton</u>, 386 Mass. 39, 52 (1982). While it is true that Nichols himself did not identify the defendant as the perpetrator, he identified the red-hatted man in the surveillance photographs as such. And the defendant's mother identified the defendant as the red-hatted man. The prosecutor did not overstep the bounds of acceptable argument when her argument connected the evidentiary dots. The judgments are therefore affirmed.

<u>So ordered</u>.