NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-95

COMMONWEALTH

vs.

RICARDO EDWARDS, JR.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Suffolk County grand jury indicted the defendant for murder in the first degree, in violation of G. L. c. 265, § 1, and unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (a).  After an evidentiary hearing, a Superior Court judge suppressed a witness's identification of the defendant from a surveillance image and prospectively precluded any in-court identification of the defendant by the witness.[1] The Commonwealth sought leave to pursue an interlocutory appeal from the judge's order.  A single justice of the Supreme Judicial Court granted leave for an appeal to this court.  See G. L. c. 278, § 28E; Mass. R. Crim. P. 15 (a) (2), as amended,

---

[1] The judge also determined that the witness's earlier description of the defendant and other individuals, provided to the police on June 1, 2017, was admissible.

476 Mass. 1501 (2017).  Concluding that the out-of-court identification was not impermissibly suggestive, but that the judge did not abuse his discretion in concluding that common law principles of fairness preclude an in-court identification, we reverse in part and affirm in part.

1.  Background.  We summarize the facts as found by the motion judge, supplemented with uncontroverted testimony of the witnesses at the suppression hearing and our independent review of documentary and video evidence admitted at the hearing.  See Commonwealth v. Tremblay, 480 Mass. 645, 654-655 (2018); Commonwealth v. Oliveira, 474 Mass. 10, 11 (2016).

On May 26, 2017, the witness and her cousin went to the Hong Kong bar in downtown Boston.  The defendant was at the bar with three other men, Calvin Murphy Peterson, Jonathan Vick, and Greg Wright, whom the witness's cousin was dating.  Just before the bar's 2 A.M. closing time, the witness and her cousin left the bar with Murphy Peterson, Vick, Wright, and the defendant. The witness did not know any of the men, did not know their names, and had spent most of her time at the bar with another man.  The parties' departure from the bar was captured on a surveillance video recording (video), the footage of which depicts not only them but at various times as many as twenty

other people.[2]  In the video footage, the defendant was wearing a white T-shirt and a backwards-facing baseball cap.  He was carrying a light-gray hooded sweatshirt.  The men offered the witness and her cousin a ride home, and the group spent at least several minutes trying to find the small blue sedan that the men had driven to the bar.

Once they located the car, the witness and her cousin got into the back seat with the defendant and Wright, Murphy Peterson got into the driver's seat, and Vick got into the front passenger seat.  The witness sat in the left rear seat behind the driver, Wright sat in the middle rear seat, and the defendant sat in the right rear seat.  The witness's cousin sat on Wright's lap.  They drove to the witness's residence, and the witness and her cousin went into the building.  Shortly thereafter, at approximately 2:35 A.M., Kevin Reyes was fatally shot in front of the building.  Neither the witness nor her cousin saw the shooting.

On June 1, 2017, Boston police detectives interviewed the witness and asked about her ride home from the bar.  During the interview, she described the driver as a light-skinned Hispanic male; the man her cousin was dating (Wright) as a male with

---

[2] The portion of the video admitted in evidence at the motion hearing lasts one minute and eleven seconds, is identified as "1st Door Front," and shows numerous patrons moving toward the front door exit.

dreadlocks; and the other man in the back seat, subsequently identified as the shooter, as heavy-set and muscular, with an "African skin tone." This man was the shortest of the men in the car at around five feet five inches tall, and he wore a white T-shirt. The witness told police that if she saw the front seat passenger or the man in the rear passenger seat (the defendant), "I'd probably walk right by them." Police did not show the witness a photo array because they had not yet identified any suspects.

After the initial interview, between June 1, 2017, and June 6, 2017, the witness saw a Boston Police Department (BPD) "flyer" on Facebook that asked for the public's help in locating two individuals wanted in relation to a homicide that had occurred in front of the witness's building on May 27, 2017. The flyer included photographs of the defendant and Wright. In the flyer photograph, the hatless defendant wore a gray shirt. The witness did not recognize the defendant from the photograph, but she recognized Wright as "Greg" whom her cousin had been dating. The flyer did not include any physical description of the defendant or what he had been wearing at the time of the shooting.

On June 8, 2017, prior to testifying before a grand jury, the witness told police that she had seen the BPD flyer and that she had learned from her cousin that the defendant's nickname

4

was "Zona" or "Arizona."  She did not know the defendant's actual name.  BPD detectives did not provide any information to the witness about their investigation.  In the grand jury, the witness described the defendant as wearing a white T-shirt, jeans, and gold and white sneakers.

On September 6, 2017, BPD detectives again interviewed the witness.  By this time, they had arrested the defendant, Murphy Peterson, and Wright.  Detectives first showed the video to the witness and asked her "if [she] recognize[d] any of these people in the video."  The witness indicated that she recognized the four men with whom she left the bar and drove in the car.[3]  Detectives then showed the witness a still image taken from the video that depicted her, her cousin, Wright, Murphy Peterson, and the defendant.[4]  Detectives asked the witness to write on the back of the still image where each of the men had been seated in the blue sedan on the night of the shooting.[5]  They did so in

---

[3] Thirty seconds into the video, all six of the party can be seen standing together.  The witness is dressed in black, her cousin is wearing a jean jacket, the defendant has a white T-shirt and blue hat worn backwards, Vick is wearing a yellow baseball cap, Murphy Peterson is in a white T-shirt, and Wright has on a plaid shirt and a red baseball cap.

[4] The photo was from the "Bar Corner" security camera and time-stamped 1:59:19 A.M.; it depicts the same scene as the video but from a slightly different angle.  There were other still images from the video admitted at the hearing, but the judge did not refer to them in his decision and they are not part of the appellate record.

[5] The witness wrote:  "The [H]ispanic boy in the picture with the white shirt i was introduced to at the club that night.  He was

5

order to memorialize what she told the detectives about the video. Police did not tell the witness that she was identifying the targets of their investigation nor otherwise mention the shooting.

On the basis of these facts, the judge concluded that the witness's physical description of the defendant given to the police in her initial interview on June 1, 2017, was admissible because it was "based on her actual recollection of the relevant events, not on any photograph or video that she was shown." He deemed the witness's statement regarding the defendant's location in the vehicle admissible for the same reason. However, the judge went on to conclude that the witness's September 6, 2017 description and identification of the defendant from the video footage were inadmissible because they were the result of "suggestive displays" of the still image. He further concluded that "any in-court identification of [the defendant] would be highly suspect and conducive to irreparable mistaken identification," and, therefore, ruled that the witness should not be asked to identify the defendant at trial.

2. Discussion. In reviewing a ruling on a motion to suppress evidence, we "accept[] the judge's subsidiary findings

---

the driver in the vehicle that night. The dark skin male in the picture with the white shirt was seated in the back right side of the car (passenger side). Greg is wearing the plaid shirt in the picture he was in the middle back seat of the car."

6

of fact absent clear error, give[] substantial deference to the judge's ultimate findings and conclusions of law, but independently review[] the correctness of the judge's application of constitutional principles to the facts found" (citation omitted). Commonwealth v. Quinones, 95 Mass. App. Ct. 156, 158-159 (2019). We "leave to the judge the responsibility of determining the weight and credibility to be given oral testimony presented at the motion hearing" (citation omitted). Commonwealth v. Mauricio, 477 Mass. 588, 591 (2017).

a. Still surveillance image. In reaching his conclusion to deny the motion to suppress in part, the judge focused solely on the still surveillance image shown to the witness and assumed the identification procedure conducted on September 6, 2017, was analogous to a one-on-one or "showup" identification. As a result, he determined that the police needed "good reason" to proceed and should have followed their "own protocols for identification[] [procedures]."[6] See Commonwealth v. Austin, 421 Mass. 357, 361 (1995). We disagree.

To begin, the procedure at issue here did not amount to a showup identification. The admissibility of the witness's

---

[6] BPD Rule 330 is a "standard protocol for utilizing various eyewitness identifications from photo lineups, live lineups, show-ups and other methods that rely upon the recollection of a percipient witness to determine the identity of an offender." A copy of the protocol was admitted in evidence at the suppression hearing.

identification of the defendant from the surveillance image is controlled in all material respects by our decision in Commonwealth v. Matos, 95 Mass. App. Ct. 343 (2019). In Matos, supra at 346, a robbery victim was asked during his grand jury testimony to identify his assailant from a series of still surveillance images taken from a hospital's security video recording just prior to the robbery. The first still image showed a man at the hospital's entrance who fit the victim's description of his "red-hatted" attacker and the second image showed the hospital entrance twelve minutes earlier, with both the victim and the man in the frame. Id. Ultimately, evidence of the identification was admitted at trial. We held that this was not a showup identification because one of the images included the victim. Id. at 347. In response to the defendant's claim that the procedure was impermissibly suggestive, we held that "asking a witness to identify him- or herself in a photograph that happens to include another person [] does not raise concerns of unnecessary suggestiveness absent some other circumstance. Nor does asking the witness to identify the other person shown in such an image raise such concerns." Id.

Here, the witness was shown both video footage and a still image in which she, the defendant, and others were depicted. Thus, it was not a showup identification. See Matos, 95 Mass.

8

App. Ct. at 347.  Contrast Commonwealth v. Dew, 478 Mass. 304, 306-307 (2017) (showup identifications are one-on-one identification procedures in which victim or witness is asked to identify suspect in immediate aftermath of crime, often near or at scene); Commonwealth v. Forte, 469 Mass. 469, 477 (2014) ("An identification stemming from a videotape containing only one individual is analogous to a one-on-one identification, which is considered inherently suggestive" [emphasis added]).  As in Matos, supra at 347-348, "the presence of the witness . . . herself in the image help[ed] to protect against any suggestiveness that otherwise inheres in a single-person identification process."  Indeed, where the video showed the defendant as one of numerous people exiting the bar, it was considerably less prone to suggestiveness than either of the images in Matos.  Similarly, the victim's presence in the still image along with other people -- considerably fewer than in the video footage but more than in the still images in Matos -- was sufficient to alleviate concerns of suggestiveness that accompany single-person photo displays.

Furthermore, "other circumstances undermine the defendant's claim [and the judge's finding] that the procedure was unnecessarily suggestive."  Matos, 95 Mass. App. Ct. at 348. The witness, like the victim in Matos, supra, had given a description of the men with whom she left the bar to police

9

shortly after the event and in her grand jury testimony approximately one week later, both "long before [s]he was shown the still image[]." Nor did police engage in impropriety when showing the witness the video; they simply asked her if she "recognized anyone." The witness's narrative regarding the video and description of the men and their location within the car as documented on the back of the still image was consistent with her earlier statements and "merely confirmed that the [video and still image] showed events and people [s]he had previously described." Id. We therefore conclude that the defendant failed to sustain his burden to show that the procedure was impermissibly suggestive.[7] Accordingly, the judge erred in determining that the witness's identification and description of the defendant from the surveillance image were the result of unnecessarily suggestive police procedures.

We further conclude that, contrary to the defendant's argument, common law principles of fairness do not require exclusion of the identification based on the witness's exposure to the police Facebook flyer. See Commonwealth v. Johnson, 473 Mass. 594, 598-599 (2016) (judge may suppress unreliable eyewitness identification if probative value of evidence is

_____

[7] Given our conclusion that this case is controlled by Matos, we need not address the defendant's subsidiary arguments that rely on the conclusion that police conducted a procedure "tantamount to a showup."

10

substantially outweighed by danger of unfair prejudice).
Although the witness saw photographs of two of the men,
including the defendant, in the flyer, the judge found that she
had "significant time to observe [the defendant] and his
location in the blue sedan" and her description of the defendant
at the motion hearing was based on "her actual recollection of
the relevant events."[8]  Thus, we are not persuaded by the
defendant's argument that the witness's exposure to the police
Facebook flyer tainted her identifications and descriptions from
the surveillance image.  See Commonwealth v. Melvin, 399 Mass.
201, 208 (1987) ("Because this first pretrial identification was
not shown to be unnecessarily suggestive, no taint attached to
the subsequent . . . identifications").

    b.  In-court identification.  We view the judge's ruling
precluding a prospective in-court identification through a
different lens.  "A judge applying '[c]ommon law principles of
fairness' has the discretion to exclude unreliable eyewitness
identification testimony."  Dew, 478 Mass. at 315.  "Even if
otherwise admissible, a judge may suppress identification
evidence if 'its probative value is substantially outweighed by
the danger of unfair prejudice'" (citation omitted).  Id.  Here,

---

[8] The judge made this determination notwithstanding his
consideration of testimony from the defendant's eyewitness
identification expert, that viewing information about an event
can cause a witness to fill memory "gaps" about an event.

11

the judge implicitly applied common law principles of fairness and reasoned that the witness's statement that she would "probably walk right by [without recognizing the defendant]," and her failure to positively identify him despite seeing his photograph on the Facebook flyer, would render an in-court identification "highly suspect."  See Johnson, 473 Mass. at 603 ("a subsequent in-court identification cannot be more reliable than the earlier out-of-court identification, given the inherent suggestiveness of in-court identifications and the passage of time").  We are satisfied that the judge's decision to exclude the witness's identification of the defendant at trial did not "fall[] outside the range of reasonable alternatives," and thus was not an abuse of his discretion.  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

3.  Conclusion.  So much of the order as allowed the defendant's motion to suppress evidence of the witness's

September 6, 2017, identification and statement to police is reversed.  The order is otherwise affirmed.

So ordered.

By the Court (Green, C.J., Vuono & Brennan, JJ.[9]),

Joseph F. Stanton

Clerk

Entered:  February 22, 2023.

---

[9] The panelists are listed in order of seniority.